**BURSOR & FISHER, P.A.**
Brittany S. Scott (State Bar No. 191626)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: bscott@bursor.com
          idiaz@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile:  (212) 989-9163
Email: pfraietta@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-mail: scott@drurylegal.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| INITO, INC., | |
| Defendant. | |

Plaintiff Jane Doe ("Plaintiff") brings this action on behalf of herself, and all others similarly situated against Inito, Inc. ("Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all California residents and individuals nationwide who have used Defendant's fertility tracker ("Fertility Tracker") through Defendant's mobile application, Inito (the "App"), and answered Defendant's onboarding survey (the "Survey").

2.      Inito's Fertility Tracker claims to "empower [women] to make informed choices about the thing that matters the most – [their] health."[1] To accomplish this task, the Fertility Tracker asks women to provide Inito with very sensitive information about their fertility, reproductive health, and menstrual cycles. Inito even creates an air of false security by telling users that their information will "remain between us" when answering Survey questions.[2] Yet, in gross violation of women's privacy rights, Inito enables Google, LLC ("Google") to intercept these confidential communications.

3.      This case is about the protection of women's privacy in their personal, intimate information related to their reproductive and sexual health. In protecting sexual and reproductive health data and keeping this data private, outside the grasp of advertisers, the overarching outcome is the protection of human dignity and personal autonomy. As the philosopher Luciano Floridi puts it, "[o]ur [human] dignity rests in being able to be the masters of our own journeys, and keep our identities and our choices open. Any technology or policy that tends to fix and mould such openness risks dehumanizing us."[3] Not respecting privacy over intimate health information also

---

[1] INITO, About Us, https://www.inito.com/en-us/about-us.

[2] *See* Figure 2.

[3] Luciano Floridi, *On Human Dignity as Foundation for the Right to Privacy*, Philos. Technol. 29, 307-312 (2016), https://link.springer.com/article/10.1007/s13347-016-0220-8.

leads to a lack of autonomy such as limiting our ability to choose how our health data gets used and whom it gets shared with.

4.      Information relating to a woman's reproductive health, fertility, and menstrual cycle is highly coveted because it can be used to make valuable inferences advertisers would love to have – such as how the stage of a woman's menstrual cycle can inform advertisers of a woman's willingness to overspend and make unplanned purchases. Indeed, advertisers are willing to pay **15 times** more for a pregnant woman's data, than that of a non-pregnant woman.

5.      Inito's mission involves "empowering users to advocate for themselves."[4]  But by enabling third-party advertisers to intercept women's sensitive data about their sexual and reproductive health without obtaining informed consent, Inito takes away a woman's ability to <u>control</u> information about her own body, commoditizes her data at a tremendous cost to a woman's own personal privacy, and infringes on her human dignity.

6.      For these reasons, Plaintiff brings this action for legal and equitable remedies.

## PARTIES

**I.     PLAINTIFF**

7.      Plaintiff is an adult citizen of California who resides in Los Angeles, California.

8.      Plaintiff has used Defendant's Fertility Tracker via the App since January 2024.

9.      Plaintiff accessed the App to keep track of her menstrual cycle and gain information about her fertile days.

10.     During the sign-up process, Plaintiff answered Inito's Survey questions.  Plaintiff's answers to the Survey questions were communications intercepted in transit by third parties – as enabled by Inito.

11.     Neither Inito nor the third parties procured Plaintiff's prior consent to this interception.

12.     Plaintiff's answering of Inito's onboarding questions has led to the unlawful interception of her sensitive communications, including information regarding her menstrual cycle,

---

[4] *Supra* note 1.

reproductive health, and fertility.  Specifically, as a result of Defendant's unlawful conduct as alleged herein, third parties intercepted information about Plaintiff.  As a result of Defendant's unlawful conduct, Plaintiff received digital advertisements from Inito on social media platforms such as Facebook and Instagram.

13.    Pursuant to the systematic process described herein, Defendant aided and assisted third parties with intercepting Plaintiff's communications in transit, including those that contained personally identifiable information, sensitive health information, and related confidential information.  Defendant aided and assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

14.    By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's communications related to her reproductive and sexual health.

15.    Plaintiff did not discover and could not have discovered Inito's unlawful conduct as alleged herein until approximately June 2024 upon her retention of counsel.

**II.    DEFENDANT**

16.    Defendant Inito, Inc. ("Inito") is a California corporation with its principal place of business in San Francisco, California.

**JURISDICTION AND VENUE**

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from the Defendant.

18.    The Court has general personal jurisdiction over Inito because Inito is a California corporation and has its principal place of business in California, meaning it is at home in the State of California.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this district.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FACTUAL ALLEGATIONS

I.    **FERTILITY/MENSTRUATION TRACKING APPS/SOFTWARE AND THEIR USES**

20.     Fertility or menstruation tracking apps/software are digital products that people use to manage their health.  Fertility or menstruation tracking software allows users to "track their menstrual cycles and receive a prediction of the start of their future cycles,"[5] meaning the date they will begin menstruating which is referred to as the start of the menstrual cycle.[6]  This software also provides users with detailed predictions of their "day of ovulation and fertile window."[7]

21.     Because of the ability to predict the ovulation date and fertile window, "[u]sers are especially attracted to menstruation-tracking apps … [and] treat these apps as birth control [by] seeking to maximize or minimize their chance of getting pregnant by changing their sexual activity accordingly."[8]

22.     Fertility/menstruation tracking software is also helpful for users looking to "improve upon their menstrual literacy and increase [their] agency [] to make informed choices about their overall health."[9]  This software allows users to increase their bodily awareness, "better prepare for

---

[5] Lauren Worsfold, Lorrae Marriott, Sarah Johnson, Joyce C. Harper, *Period Tracker Applications: What Menstrual Cycle Information Are They Giving Women*, WOMEN'S HEALTH, Oct. 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8504278/#:~:text=Period%20tracking%20applications%20(apps)%20allow,day%20and%20the%20fertile%20window.

[6] NHS, *Periods and Fertility in the Menstrual Cycle*, https://www.nhs.uk/conditions/periods/fertility-in-the-menstrual-cycle/#:~:text=The%20first%20day%20of%20a%20woman's%20period%20is%20day%201,Find%20out%20about%20heavy%20periods.

[7] *Id.*

[8] Tahsin M. Ahmed, *LEAK! The Legal Consequences of Data Misuse in Menstruation-Tracking Apps*, 111 Calif. L. Rev. 1979, 1982-83 (2023) (citing Rasha Ali, *Do Period Tracker Apps Work as a Birth Control Replacement?*, USA TODAY (Aug. 8, 2019), https://www.usatoday.com/story/life/health-wellness/2019/08/08/can-period-tracker-apps-replace-condoms-and-pill-not-really/1888837001/).

[9] Bridget G. Kelly & Maniza Habib, *Missed period? The significance of period-tracking applications in a post-Roe America*, Sept. 8, 2023, SEX REPROD HEALTH MATTERS, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10494721/ (citing Eschler J, Menking A, Fox S & Uba Backonja, *Defining Menstrual Literacy With the Aim of Evaluating Mobile Menstrual Tracking Applications*, 37 COMPUT INFORM NURS. 638–646 (2019), doi: 10.1097/CIN.0000000000000559).

---

future periods, engage in conversations with healthcare providers," "recognize body patterns or identify any changes or abnormalities within their cycle."[10]

## II.    DATA PRIVACY CONCERNS SURROUNDING FERTILITY/MENSTRUAL TRACKING SOFTWARE/APPS

23.    While Inito markets its Fertility Tracker as a helpful tool that allows women to gain agency in their sexual and reproductive care, it fails to reasonably inform its users that using the tracker comes at great expense to users' privacy.

24.    The type of information a third party can infer from the data gathered through a menstruation tracker can be worth a lot of money.  For example, "[t]he data of pregnant women is particularly valuable to advertisers: expecting parents are consumers who are likely to change to their purchasing habits . . . ."[11]  Thus, while "an average person's data is worth $0.10" a "pregnant woman's will be $1.50."[12]  Further, the spending habits of a woman will vary based on the menstrual cycle phase they are in.[13]  A study found that women in the luteal phase of their menstrual cycle – the phase in the cycle that "starts after ovulation and ends with the first day of [the] period"[14] – engaged in spending that was "less controlled, more impulsive and more excessive compared to earlier phases of their menstrual cycle.[15]  Specifically, "almost two-thirds of women" in the luteal phase "spen[t] more money than they had intended to and [had] a greater incidence of unplanned spending or purchasing of items on impulse."[16]  Allowing third-party companies, and especially marketing companies such as Google, to access sensitive information

---

[10] *Id.*

[11] *No Body's Business but Mine: How Menstruation Apps Are Sharing Your Data*, PRIVACY INT'L (2019), https://privacyinternational.org/long-read/3196/no-bodys-business-mine-how-menstruations-apps-are-sharing-your-data.

[12] *Id.*

[13] Karen J. Pine & Ben Fletcher, *Women's spending behaviour is menstrual-cycle sensitive*, 50 Personality and Individual Differences 74, (2011).

[14] All About the Luteal Phase of the Menstrual Cycle, https://www.healthline.com/health/womens-health/luteal-phase#what-happens

[15] *Supra*, note 12.

[16] *Id.*

---

about a consumer's menstrual cycle, sexual health, and reproductive health places women in the compromised position of having their sensitive data used against them for targeted advertising.

25.     Serious privacy concerns arise with companies' practice of sharing reproductive and sexual health information – such as information collected via menstrual tracking apps – with unauthorized third parties.  Allowing this data to be commoditized and sold to third-party companies deprives consumers of the ability to control information about their own bodies.

26.     Aside from this sensitive data being used against fertility-tracking software users for marketing purposes, information on fertility-tracking apps that allows someone to infer a user had an abortion "could potentially become criminal evidence" given that some states in the United States have criminalized abortion.[17]  "As such, the social and psychological consequences of this data being leaked are of a delicate and potentially humiliating nature, elevating the need to adequately protect this information."[18]

### III.     BACKGROUND OF THE CALIFORNIA INFORMATION PRIVACY ACT

27.     The California Information Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully – and without the consent of all parties to a communication – read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

28.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or

---

[17] Kelly & Habib, *supra* note 7.

[18] Ahmed, *supra* note 5, at 1994.

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state, Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

29.    Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Meta's collection of consumers' internet browsing history).

30.    Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

## IV.    DEFENDANT'S MOBILE APP

31.    Inito is an at-home ovulation testing kit manufacturer that focuses its business on assisting users with getting pregnant.  Defendant states its mission is to "simplify healthcare and wellness by equipping every household with the most advanced health trackers"[19]  As part of its business, Defendant provides users with a tracker that is accessible on mobile devices via its App. The Fertility Tracker is designed to track "everything so you don't have to."[20]

---

[19] *Supra* note 1.

[20] INITO, https://try.inito.com/hormone-tracking/?campaignid=21009861827&adgroupid=164418300211&keyword=inito&device=c&gad_source=1&gclid=CjwKCAjw1920BhA3EiwAJT3lSd8qryqwaJ8mgeupMWuOdftOEwhWpysqXp6vRXgEmF2AEUwnBnNBdhoC--EQAvD_BwE.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.    TESTING REVEALS THAT DEFENDAN ENABLES GOOGLE TO INTERCEPT USERS' SENSITIVE COMMUNICATIONS WITH DEFENDANT VIA THE APP

32.    Defendant has enabled, and continues to enable, Google to intercept users' answers to Defendant's Survey, including whether the user is trying to get pregnant, how long the user has been trying to conceive, and the user's prior medical history, along with the fact that the user is using the Fertility Tracker and used the tracker to calculate their predicted ovulating/fertile days and menstruating days in the current or upcoming menstrual cycle.

33.    Defendant aided and assisted the above-described interceptions through the use of Google's Google Analytics software, run through Google's Firebase platform for mobile applications.  Specifically, Google intercepted, and continues to intercept, Survey answers through a tool used by the Firebase platform – namely, https://app-measurement.com.[21]

34.    Google intercepted, and continues to intercept, the communications at issue in a data format called Protocol Buffers, or Protobuf.  Protobuf is a format that Google designed to make data serialization and deserialization more efficient.[22]

35.    Data serialization is a "process of converting an object into a stream of bytes to more easily save or transmit it."[23]  "Serialization enables us to save the state of an object and recreate the object in a new location."[24]  In sum, serialization "encompasses both the storage of the object and exchange of data."[25]  The deserialization process then "recreates the object."[26]

36.    Protobuf is "like JSON, except it's smaller and faster."[27]  It is the "most commonly-used data format at Google."[28]

---

[21] Kate O'Flaherty, *Meet Lockdown, The App That Reveals Who's Tracking You on Your iPhone*, Forbes (Mar. 6, 2020), https://www.forbes.com/sites/kateoflahertyuk/2020/03/06/meet-lockdown-the-app-that-reveals-whos-tracking-you-on-your-iphone/.

[22] Gbadebo Bello, What is Protobuf?, (Feb. 13, 2024) https://blog.postman.com/what-is-protobuf/.

[23] What is Serialization?, HAZELCAST, https://hazelcast.com/glossary/serialization/.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Protocol Buffers Documentation, https://protobuf.dev/overview/#:~:text=Protocol%20Buffers%20are%20a%20language,it%20generates%20native%20language%20bindings.

[28] *Id.*

37.    Figure 1 shows a summary of the data and communications transmissions from the InitoApp to Google when a user answers Defendant's Survey questions:

**Figure 1**

```
Phone16,2
ios 17.4.1
75EE839C-AF62-4A33-9863-3CC126AD8C2D
United States
UserAge 28 years
UserHeight 158 cms
UserWeight 147 lb
CycleRange 2024-04-19 - 2024-05-24
localTime 16:48
IsPregnancyCycle no
AppGoal Get pregnant
averageCycleLength 35.5
HowLongTryingToConcieve More than 1 year
AnyPastIssues         PCOS/PCOD
oneFertilityTreatment Fertility Medications
UsedFertilityKits Period Tracking Apps
currentMode CyclePrediction
cyclesSinceOnboarding 1
currentCycleDay 12
```

## VI.    GOOGLE'S FIREBASE PLATFORM

38.    Defendant utilizes Google's website and app development platform, Firebase, thereby intentionally and knowingly integrating the Google Analytics software into its App. Defendant enables Google to intercept Plaintiff's and Class Members' communications by integrating and embedding Google Analytics into the App through the Firebase platform in the manner described throughout this Complaint.[29]

39.    "At the heart of Firebase is Google Analytics, an unlimited analytics solution available at no charge"[30] to the Firebase customers.  Google Analytics "help[s] [app owners] understand clearly how [] users behave, which enables [them] to make informed decisions regarding app marketing and performance optimizations."[31]

---

[29] FIREBASE, GOOGLE ANALYTICS, https://firebase.google.com/docs/analytics.

[30] *Id.*

[31] *Id.*

40.    The Google Analytics software, is a piece of code installed on a website or app that collects information on how website or app users interact with a business's platform, such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[32]

41.    The Google Analytics software development kit "automatically captures a number of events and user properties and also allows [Firebase users] to define [their] own custom events to measure the things that uniquely matter to [their] business."[33]  Once Google Analytics intercepts an app user's data and communications, that information "is available in a dashboard through the Firebase console."[34]  Importantly, in order to provide "detailed insights" about the information, Google analyzes the information before providing it to any entity that was a party to the conversation (*e.g.*, Defendant) through the Firebase console.[35]

42.    When a user accesses a website or app hosting Google Analytics, Google's software surreptitiously directs the user's browser or app to simultaneously send a separate message to Google's servers.  This second, secret transmission contains the data Google Analytics is configured to collect.  This transmission is initiated by Google code and concurrent with the communications with the host website or app.  In other words, when a user communicates with Defendant's App, those communications are simultaneously and contemporaneously duplicated and sent to Google at the same time as they are being sent to Defendant.  Thus, Google's interception of these communications occurs "in transit."

43.    Once Google intercepts communications, it has the capability to use such information for its own purposes beyond recording the communications for the website and app owners.  "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

1    fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and

2    apps."[36]

3         44.    Google's business model involves entering into voluntary partnerships with various

4    companies and surveilling communications on their partners' websites and apps with Google

5    Analytics.

6         45.    Thus, through websites and apps that employ Google's services, such as Inito's

7    App, Google directly intercepts the electronic communications of platform visitors such as answers

8    to the Survey.

9         46.    Google's range of software services is based on Google's ability to collect and

10    analyze information about individuals' online behavior and deliver targeted advertising to select

11    individuals based on their online habits.  This involves collecting information from thousands of

12    websites and apps and then analyzing that information in order to deliver targeted advertising and

13    group individuals for targeting.

14         47.    Information from apps, like Defendant's App, is central to Google's ability to

15    successfully market its advertising capabilities to future clients.

16         48.    In sum, Google has the capability to use app communications to: (i) improve its own

17    products and services; (ii) develop new Google for Business and Google Analytics products and

18    services; and (iii) analyze app visitors' communications to assist with data analytics and targeted

19    advertising.

20    **VII.    HOW DEFENDANT AIDED AND ASSISTED GOOGLE'S INTERCEPTION OF
21    PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE COMMUNICATIONS
      ABOUT THEIR SEXUAL AND REPRODUCTIVE HEALTH**

22         49.    At relevant times, Defendant installed and embedded Google Analytics software

23    into the code of its App to track its users' actions when using its Fertility Tracker.  Through the use

24    of Google Analytics, Defendant aided and assisted Google in intercepting Plaintiff's and Class

25    Members' communications with Defendant as they answered questions to Defendant's Survey,

26    including whether the user was trying to get pregnant, how long the user had been trying to

27

28    ---
      [36] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

conceive, and the user's prior medical history, along with the fact that users were using a Fertility

Tracker and used the tracker to calculate their predicted ovulating/fertile days and menstruating

days in the current or upcoming menstrual cycle.

50.    The following is an example of the communications Defendant aided and assisted

Google in intercepting via the App.

51.    When a person uses Defendant's Fertility Tracker via the App to calculate the

pertinent information that the Fertility Tracker provides – *e.g.*, the person's predicted

ovulation/fertility period and predicted menstruating period for the current or upcoming menstrual

cycle – the App prompts the user to answer a number of questions related to the user's sexual and

reproductive health.  Significantly, Defendant initially informs users via the App that "all

information will remain between us," reassuring users that their sensitive data will be kept

confidential.  *See* Figure 2.

### Figure 2



To help you better we need to learn something about you. All information will remain between us

1

2       52.     As alleged above, the App requires users to answer several questions that elicit

3  intimate data about a woman's health and body.  For example, the user must input her age, height,

4  weight, whether she is trying to get pregnant, how long she has been trying to conceive, her prior

5  medical history, whether she has undergone any fertility treatments, whether she has used any other

6  fertility products, when her last period was, and information about her prior menstrual cycles.  *See*

7  Figures 3-9.

8

<u>**Figure 3**</u>

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Figure 4**



**Figure 5**



1

**Figure 6**

2

3

4



5

6

7

8

9

10

11

12

13

14

**Figure 7**

15

16

17

18



19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Figure 8**



**Figure 9**



53.     In direct contravention of Defendant's representation that users' communications with Defendant via the App would "remain between us," at relevant times, and presently, Defendant aided and assisted, and continues to aid and assist, Google in intercepting users' communications with Defendant, specifically, users' answers to the Survey questions.

54.     For example, when users answer the question about their age, height and weight, Google intercepts all three values.  Google also intercepts, *inter alia*, the users' cycle ranges by date, whether they are currently fertile, what their goals are in using the App, what their average cycle length is, how long they have been trying to conceive, their past medical diagnoses, how many fertility treatments they have received, and the date ranges of past menstrual cycles.

## **CLASS ALLEGATIONS**

55.     Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as all persons in the United States who, during the class period, answered Inito's onboarding Survey on the App (the "Class" or "Nationwide Class").

56.     Plaintiff also seeks to represent a subclass consisting of Class Members who, during the class period, answered Inito's Survey on the App while in California (the "California Subclass" or "Subclass") (Nationwide Class and Subclass, collectively, the "Classes").

57.     Plaintiff reserves the right to modify the class definition or add subclasses as necessary prior to filing a motion for class certification.

58.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

59.     Excluded from the Classes are Inito; any affiliate, parent, or subsidiary of Inito; any entity in which Inito has a controlling interest; any officer director, or employee of Inito; any successor or assign of Inito; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

60. **Numerosity.** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class. Class Members can be readily identified from Inito's records and non-party records, such as those of Google.

61. **Typicality.** Plaintiff's claims are typical of the claims of the Classes because Plaintiff, like all other members, used Inito's App and had her confidential electronic communications intercepted and disclosed to a third party.

62. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

63. **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include, but are not limited to, the following: whether Defendant violated CIPA § 631 and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

64. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management

of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this

action that would preclude its maintenance as a class action.

**COUNT I**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf Of The Nationwide Class and California Subclass)**

65.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth

herein.

66.     Plaintiff brings this claim against Defendant, Inito individually and on behalf of the

Classes.

67.     To establish liability under CIPA § 631(a), a plaintiff need only establish that the

defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any

of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

68.     CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies"

such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21

(N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to

effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022

WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

69.     Google's Google Analytics software is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

70.     Moreover, Google, is a separate legal entity from Defendant that offers software-as-a-service and not merely a passive device.  Further, Google has the capability to use the intercepted information for its own purposes.  Accordingly, at relevant times, Google was, and continues to be, a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.

71.     At relevant times, Google, willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

72.     At relevant times, Google used or attempted to use the communications intercepted by its Google Analytics software via the Firebase platform to promote and improve its advertising platforms.

73.     At relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Google to wiretap Plaintiff and Class Members communications with Defendant via the App using Google Analytics through the Firebase platform to accomplish the wrongful conduct at issue here.

74.     Plaintiff and Class Members did not provide their prior consent to third parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Google's conduct.

75.     The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Inito App and/or where Google – as enabled by Inito – routed Plaintiff and Class Members' electronic communications to their servers.

76.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a) and seek statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT II**
**Invasion Privacy Under California's Constitution**
**(On Behalf of The Nationwide Class and California Subclass)**

77.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

78.     Plaintiff, Class, and Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their sexual and reproductive health; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff, Class, and Subclass Members' knowledge or consent.

79.     At all relevant times, by installing and embedding Google Analytics into the App so that Google could intercept users' private communications with Defendant regarding users' sexual and reproductive health, Defendant intentionally invaded Plaintiff's, Class, and Subclass Members' privacy rights under the California Constitution by disclosing their private information.

80.     Plaintiff, Class, and Subclass Members had a reasonable expectation that their communications about their fertility, sexual activity, health conditions and other private information, would remain confidential and that Defendant would not install wiretaps on the App. Defendant even represented to Plaintiff, Class, and Subclass Members that their data would "remain between us."

81.     Plaintiff, Class, and Subclass Members did not authorize Defendant to record and transmit Plaintiff's, Class, and Subclass Members' private medical communications alongside their personally identifiable health information.

82.     This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private sexual and reproductive health communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

83.     Accordingly, Plaintiff, Class, and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution.

<u>COUNT III</u>
**Intrusion Upon Seclusion**
**(On Behalf of The Nationwide Class and California Subclass)**

84.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

85.     Plaintiff, Class, and Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their sexual and reproductive health; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff, Class, and Subclass Members' knowledge or consent.

86.     At all relevant times, by installing and embedding Google Analytics into the App so that Google could intercept users' private communications with Defendant regarding users' sexual and reproductive health, Defendant intentionally invaded Plaintiff's, Class, and Subclass Members' privacy rights under the California Constitution by intruding into their private place, conversation or matter.  Defendant's actions amount to an intrusion upon Plaintiff and the Classes' privacy because Plaintiff, Class and Subclass Members did not consent to the particular conduct that Defendant engaged in – allowing third parties to intercept their sensitive conversations.

87.     Plaintiff, Class, and Subclass Members had a reasonable expectation that their communications about their fertility, sexual activity, health conditions and other private information, would remain confidential and that Defendant would not install wiretaps on the App. Defendant even represented to Plaintiff, Class, and Subclass Members that their data would "remain between us."

88.    This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private sexual and reproductive health communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

82.    Accordingly, Plaintiff, Class, and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a.  For a determination that this action is a proper class action;

    b.  For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

    c.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

    d.  For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

    e.  For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

    f.  For punitive damages, as warranted, in an amount to be determined at trial;

    g.  For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

    h.  For prejudgment interest on all amounts awarded;

    i.  For injunctive relief as pleaded or as the Court may deem proper;

    j.  For an order awarding Plaintiff, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

    k.  For an order granting Plaintiff, Class, and Subclass Members such further relief as the Court deems appropriate.

1

## **JURY TRIAL DEMANDED**

2

Plaintiff demands a trial by jury on all claims so triable.

3

4

Dated:  November 25, 2024

**BURSOR & FISHER, P.A**.

5

By: ___*/s/ Brittany S. Scott*___
            Brittany S. Scott

6

7

Brittany S. Scott (State Bar No. 191626)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: bscott@bursor.com
          idiaz@bursor.com

8

9

10

11

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile:  (212) 989-9163
Email: pfraietta@bursor.com

12

13

14

15

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-mail: scott@drurylegal.com

16

17

18

*Attorneys for Plaintiff*

19

20

21

22

23

24

25

26

27

28